# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                              **Case No. 07-CR-219**

**LARRY LUPTON**
        **Defendant.**

## FINDINGS OF FACT AND VERDICT

The government charged defendant Larry Lupton with bribery (count one), 18 U.S.C. § 666(a)(1)(B), wire fraud (count two), 18 U.S.C. §§ 1343 & 1346, and two counts of making false statements to an FBI agent (counts three and four), 18 U.S.C. § 1001. The parties agreed to a court trial, and defendant requested specific findings of fact pursuant to Fed. R. Crim. P. 23(c). Those findings follow.

### I. GENERAL FINDINGS

In November 2006, Equis Corporation engaged defendant as an independent contractor to provide real estate brokerage services to Equis's clients. Equis was to pay defendant a percentage, generally 50%, of the company's commissions on sales defendant brokered. (Trial Stipulation at 3 ¶ 3; Ex. 1.) Defendant also received advance draws from Equis in the amount of $6000 per month, with any earned commissions being first applied to outstanding draw amounts. During the course of his employment with Equis from November 2006 through May 15, 2007, defendant received a total of $39,000 in draw advances and was credited with just one commission, in the amount of $11,234.80, all of which was applied to his outstanding draw balance. (Trial Stipulation at 3 ¶ 4.) According to defendant's tax return for 2006, his adjusted

gross income was $281. (Ex. 21.) On December 8, 2006, the bank holding a mortgage on defendant's home obtained a judgment of foreclosure (Ex. 31), and according to records from a Milwaukee casino, defendant sustained significant gambling losses in early 2007 (Ex. 41 & 42).

On January 26, 2007, Equis and the Wisconsin Department of Administration ("DOA") entered into an Exclusive Listing Agreement ("ELA") with respect to the sale of the DOA office building in Madison, Wisconsin. Under the terms of the ELA, Equis agreed to act as the DOA's broker for the sale. (Trial Stipulation at 3 ¶ 2; Ex. 4.) Equis assigned defendant to work on the sale, and in February 2007 defendant sent out an offering memorandum soliciting proposals from parties interested in buying the DOA building. (Trial Stipulation at 4 ¶ 5; Ex. 5.) Defendant received a total of thirteen responses from interested parties. In March 2007, defendant contacted the responding parties and asked each to submit a final Letter of Intent ("LOI") containing specific proposal information. (Trial Stipulation at 4 ¶ 6.) Defendant prepared a form LOI and provided it to the interested parties. (Trial Stipulation at 4 ¶ 6; Ex. 6.) One of the specific terms of the form LOI was that the "parties . . . keep the terms of this letter of intent confidential." (Ex. 6 at 2.) In response, defendant received various LOI's from interested parties, which generally followed defendant's suggested format, including the confidentiality provision. (Trial Stipulation at 4 ¶ 6; Ex. 7-13.)

One of the LOI parties was Zeller Realty Group, based in Chicago, Illinois, represented by a broker named Gabriel Silverstein. (Trial Stipulation at 4 ¶¶ 8-9.) Silverstein testified that he had been a broker for fourteen years, and that he knew defendant from a stint at Equis in

2

the early 2000's.[1] On or about April 4, 2007, defendant called Silverstein at Silverstein's Chicago office, and asked Silverstein for a "kickback" on Silverstein's commission on the sale of the DOA bulding. Silverstein related defendant's words as being to the effect of "I don't know if this is right, I guess its not, but I'm looking for some kind of kickback." Silverstein testified that fee splitting conversations were common between brokers, but he had never before been approached like this; defendant was not proposing a commission share, but a kickback. Shocked by the call, after speaking to his companion and his attorney, Silverstein contacted Wisconsin state authorities. About two weeks later he met with authorities and agreed to cooperate in their investigation, which included recording conversations. (Trial Stipulation at 4 ¶ 9.)[2]

At the direction of law enforcement, on April 26, 2007, Silverstein, wearing a recording device, met with defendant in person at defendant's office in Brookfield, Wisconsin. During the meeting, defendant stated that he wasn't "making much money" and that he had talked to a couple of other parties who had agreed to pay him between a quarter and a half a point. He then asked Silverstein for an "assurance" that "if I could put you into that situation . . . that you guys can get me a quarter point." (Ex. 51A at 1-2.)[3] Silverstein asked how that could be done,

---

[1] Silverstein testified that when he worked at Equis his name was Chris Peterson; he changed his name after converting to Judaism. He stated that after Equis terminated his contract he consulted for a time, then started his own company. He testified that he was not provided a reason for termination and had no hard feelings about it.

[2] Silverstein testified that the recordings played at trial, exhibits 51, 54, 56, 58-60, 62 and 63, accurately captured his conversations with defendant.

[3] At trial, defendant raised an issue with the accuracy of some of the transcripts accompanying the recordings. I granted him permission to file an errata sheet, but he has not done so. As the parties agreed at trial, the recordings are the evidence, not the transcripts prepared by the government. However, after listening to the recordings, I find no material

3

and defendant stated that Silverstein could "take the taxes out . . . and just give me cash or check sort of thing or you could just allocate it as a consultant fee to a different company that I have which is NACO." (Ex. 51A at 2.) Defendant continued: "And obviously I don't want anything in writing you know, cause you know, I don't want it leaked back to the State or you know, or to Equis per se so." (Ex. 51A at 2.) Silverstein asked what defendant could do for Zeller in return for the payment, and defendant replied that he would "make sure you guys know the expectations of the State . . . I just got to make sure that you guys are in line to be the top, you know, the top 1 or 2 to get back in here . . ." Defendant further stated "everyone else, I'm not I'm not giving this sort of information. . . . I'm close lipped." (Ex. 51A at 3.) Silverstein confirmed that defendant wanted "a quarter," to which defendant relied: "Yeah. I'm not trying to get greedy." (Ex. 51A at 4.) Silverstein again asked "how do you make sure I get something then?" Defendant replied that if Zeller's numbers were "in the game" he would "run the analysis and basically back you." (Ex. 51A at 4-5.) Defendant stated that if Zeller's numbers were out of range, his hands would be tied; "I got to do technically the right thing for the State." (Ex. 51A at 9.) Silverstein asked what would happen if other parties' offers improved, and defendant replied "I'll have to let you know . . . you guys can ah come back in and match it." (Ex. 51A at 9.) Silverstein asked if, after the closing, defendant wanted him to come back and pay defendant separately, and defendant responded affirmatively. (Ex. 51A at 11.)

---

variance with the transcripts. Specifically, I find that during the April 26, 2007 meeting, defendant asked for a quarter point "if I could put you into that situation." Defendant claimed that he said "if I get put into that situation," meaning if the State cut Equis's commission. I find that is not what he said. Silverstein testified that defendant was referring to putting Zeller "into that situation," i.e. winning the sale. Silverstein denied that defendant said "if I get put into that situation." I found Silverstein's testimony credible.

4

Again at the direction of law enforcement, Silverstein recorded additional phone calls with defendant. On April 27, 2007, at 11:41 a.m., defendant called Silverstein and described the best current offer, from a company called Roebling Investments. (Ex. 54A at 1.) Defendant stated that the offer was at that point verbal and subject to change, and he promised to let Silverstein know once he saw it in writing. (Ex. 54A at 3.) Silverstein testified that during this call defendant provided the terms of the Roebling offer, so that he could then match or beat those terms on behalf of Zeller, and defendant would then recommend Zeller.

On April 30, 2007, at 10:30 a.m., defendant called Silverstein to tell him "where the best LOI came back at." (Ex. 56A at 1.) Defendant then provided specific details on the Roebling LOI. (Compare Ex. 56A at 1-2; with Ex. 11.)

At trial, defendant testified and presented an exhibit indicating that he received the written Roebling LOI, which contained a confidentiality clause, at 12:01 p.m. on April 30, 2007 (Ex. 1039), after his conversation with Silverstein in which he disclosed the details of the LOI. I find that defendant received the written LOI prior to his 10:30 a.m. conversation with Silverstein. First, during the April 27 conversation, defendant promised to contact Silverstein after he received the written LOI from Roebling. (Ex. 54A at 3.) Second, during the April 30 10:30 a.m. call defendant spoke in the past tense. (Ex. 56A at 1 – "I just wanted to let you know where the best LOI came back at."; Ex. 56A at 2 – "That's the best one I got."; Ex. 56A at 2 "they wrote 3 options".) Third, the government submitted a copy of the Roebling LOI containing defendant's hand-written notes, which matched up with some of the comments he made to Silverstein during the 10:30 a.m. phone call. (Ex. 14.) Confronted with this contrary evidence, on cross examination defendant backed off and stated that he could not recall if he received the LOI before he called Silverstein. I find that defendant received the written LOI,

5

which contained a confidentiality clause, before he called Silverstein on April 30, 2007.[4]

Silverstein called defendant back at 6:05 p.m. on April 30, and asked if defendant was in the same spot as before. Defendant said he was, but that he had received a proposal from a company called Arlen, which he had not yet opened. Silverstein asked defendant to call him if anything different came in so he could make the necessary changes. (Ex. 58A.) At 6:26 p.m., defendant left Silverstein a message providing details of the Arlen proposal, indicating that it would not "fly with the state" and that Roebling was the "only competition." (Ex. 59A at 1.) Silverstein returned the call a few minutes later, and the two discussed what the Zeller proposal would be. (Ex. 60A.) On May 1, 2007, defendant called Silverstein and indicated that he had met with the DOA and "made the recommendations" to put Zeller number one and Roebling number two. (Ex. 62A at 1.)

On May 10, 2007, FBI Special Agent Terry Sparacino and a state law enforcement officer executed a search warrant at defendant's Brookfield, Wisconsin office. Defendant agreed to an interview with Sparacino, which took place in a conference room in defendant's building. Sparacino asked defendant if he ever provided confidential bid information to other buyers; defendant denied that he had and stated that he knew that was not permitted. Sparacino asked defendant if he ever solicited a kickback; defendant denied that he had. Sparacino asked defendant if he ever disclosed specific bid details; defendant said no, he spoke only in generalities. Sparacino asked defendant how he expected to be paid in

---

[4]Defendant argument's as to the timing was inconsistent with his broader argument that all of the LOI's were open and could be disclosed, and that the confidentiality clause in the LOI's applied not to him but to the LOI parties to prevent them from colluding. Defendant's claim that the confidentiality clause existed only to prevent collateral communication between the LOI parties was unpersuasive. In context, the term "parties" clearly referred to the buyer and seller, not other interested buyers.

6

connection with the sale, and defendant replied by Equis. Defendant said nothing about being paid by the buyer, about representing others in the transaction, about "dual agency" or about "designated agency." At the conclusion of the interview, Sparacino asked defendant not to contact anyone else involved in the sale.

As Sparacino and the state agent were walking to their cars outside defendant's office, Silverstein called the state agent and indicated that defendant had just called him (Silverstein). Silverstein recorded the call. Ostensibly trying to sound casual, defendant, "just out of curiosity," asked if the FBI had contacted Silverstein. (Ex. 63A at 1.) Silverstein asked what was going on, and defendant said he "just got a couple a calls from them" and that he wasn't sure if it actually was the FBI or press members posing as FBI agents. Silverstein asked what they said, and defendant replied "something about like some sort of deal structures that have been leaked out." (Ex. 63A at 1.) Silverstein responded: "That's interesting. I haven't gotten a call." (Ex. 63A at 1.)[5]

On May 18, 2007, Sparacino again interviewed defendant. Defendant denied soliciting a direct payment in connection with the sale of the DOA building. He also denied soliciting a payment from Silverstein in cash or via check payable to another company, like NACO. Defendant stated that if these subjects were discussed, Silverstein brought them up.[6] Sparacino knew that these statements were inconsistent with the recorded conversations; defendant did not at the time know about the recordings.

At trial, defendant denied any corrupt or fraudulent intent. Rather, he claimed that he

---

[5]Silverstein testified that he got one further call from defendant, which he did not record, in which defendant referred to him as the "confidential informant."

[6]Defendant also told Sparacino that he had closed NACO's bank accounts.

7

was exploring a role as a designated agent for Silverstein's client and a split of Silverstein's commission. For the reasons set forth herein, I found his testimony incredible. I found Silverstein's contrary testimony credible.

## II. SPECIFIC COUNTS

### A. Count One

In count one, the government alleged that defendant corruptly solicited something of value from Silverstein, intending to be influenced or rewarded in connection with a business, transaction, and series of transactions of the State of Wisconsin Department of Administration involving something with a value of $5000 or more. In order to sustain this charge, the government had to prove that: (1) defendant was an agent of a state government or agency of that government; (2) defendant solicited, demanded, accepted or agreed to accept anything of value from another person; (3) defendant did so corruptly with the intent to be influenced or rewarded in connection with some business, transaction or series of transactions of the state government or agency; (4) this business, transaction or series of transactions involved any thing of a value of $5,000 or more; and (5) the state government or agency, in a one year period, received benefits of more than $10,000 under any federal program. Federal Criminal Jury Instructions of the Seventh Circuit 216 (1999). The government proved these elements beyond a reasonable doubt.

**First**, the government established that defendant was an agent. An "agent" is a person who is authorized to act on behalf of a government or agency, including an employee, officer or representative. Id. at 218. The evidence showed that defendant was authorized to act on behalf of the Wisconsin DOA in connection with the sale of the DOA building. The DOA

8

contracted with Equis to be the DOA's exclusive agent regarding the sale (Ex. 4 at 1 ¶ 1), and Equis in turn assigned defendant to be the primary contact person for the interested buyers. In connection with that assignment, defendant, <u>inter alia</u>, sent out an offering memorandum, developed and sent out a template LOI, then analyzed the LOI's received in order to make recommendations to the State. Defendant was also responsible for communicating with potential buyers on behalf of the State and developing the proposals to the State's advantage.[7]

**Second**, defendant solicited a payment of a quarter point from Silverstein. Silverstein believed defendant to be requesting 25% of his commission, or about $75,000. While defendant argued at trial that he was soliciting a fee split, rather than a kickback, the payment undoubtedly constituted something "of value."[8]

**Third**, defendant solicited the payment corruptly with the intent to be influenced in connection with the sale of the DOA building. A person acts "corruptly" when he acts with the understanding that something of value is to be offered or given to reward or influence him in connection with his organizational duties. <u>Federal Criminal Jury Instructions of the Seventh Circuit</u> 216 (1999). The recorded conversations make clear that defendant solicited the payment from Silverstein in exchange for steering the sale to Zeller. He sought an "assurance" of a "quarter point" if he could "put [Zeller] into that situation." (Ex. 51A at 1-2.) Silverstein

---

[7]In a pre-trial motion, defendant noted that under the master contract between the State and Equis, Equis's employees and sub-contractors were not to be considered agents of the State. (<u>See</u> Ex. 1063.) As I noted in denying the motion, the evidence at trial would determine whether defendant was an agent within the meaning of § 666. I find that the evidence showed defendant was an agent of the Wisconsin DOA. Parties may not alter a statutory term by contract.

[8]Silverstein expected a commission of $300,000 to $360,000, some of which he would share with a Madison broker. He testified that he ultimately received nothing arising out of these events.

9

asked defendant "how can you help me" in return, and defendant replied that he would "make sure that you guys know the expectations of the State. I mean I got to just make sure that you guys are in line to be the top . . . . I mean everyone else, I'm not I'm not giving this sort of information to . . . . You know I'm close lipped . . . " (Ex. 51A at 3.) Defendant also indicated that Zeller did not have to present its truly best offer, or the best offer of all the LOI parties. Instead, defendant stated that "as long as you're in the game . . . I run the analysis and basically back you." (Ex. 51A at 5.) Finally, defendant's corrupt intent is made manifest by his request for payment in cash or as a consultant fee to his defunct company, NACO, with nothing in writing or leaked back to the State or to Equis. (Ex. 51A at 2.)

As defendant noted in a pre-trial motion, the bribery statute does not cover "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). The unusual maneuvering discussed above reveals that this was not to be a payment in the ordinary course of business. I reject defendant's testimony to the contrary. As Silverstein testified, in order to fee split, a writing is required; here, defendant specifically said he did not "want anything in writing." (Ex. 51A at 2.)

Defendant's attempts to explain away his requests of Silverstein failed. On cross examination, defendant claimed he did not know precisely what he meant when he asked Silverstein for "a quarter point." When the government asked what he would do to earn this money, defendant was also vague, stating that Silverstein could use his Wisconsin broker's license to complete the transaction. But he also claimed that he would do no more for Zeller than anyone else. When confronted with the recorded call in which he stated that he "made the recommendations" to put Zeller number one, defendant admitted this could be considered a lie or maybe "salesmanship"; he denied making such a recommendation. When asked about

10

receiving a direct payment, which would violate his contract with Equis (Ex. 1 at 4), defendant stated that when a party agreed to pay him, he meant pay Equis. When asked about the conversation where he said "I don't want it leaked back to the State" he meant "they" – presumably Equis – did not want it leaked back because it could harm Equis's negotiating position with the State regarding a possible commission cut. Of course, defendant also stated that he wanted nothing leaked back to Equis either, making his testimony in this regard entirely unreasonable.

The government also presented evidence as to defendant's motive to obtain this secret, corrupt payment. Defendant was in financial distress in late 2006 and early 2007. His 2006 income was minimal, his house had recently been foreclosed, and his gambling losses totaled thousands of dollars. By keeping the payment secret from Equis he could avoid application of the payment to his draws.

**Fourth**, the subject transaction involved a value of $5,000 or more. The parties stipulated that the DOA building has an estimated value of between $20,000,000 and $30,000,000. (Trial Stipulation at 5 ¶ 11.) **Fifth**, the parties stipulated that during the one-year period beginning June 1, 2006, and ending May 31, 2007, the State of Wisconsin received benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance. (Trial Stipulation at 5 ¶ 12.)

Therefore, I find defendant guilty of count one.

**B.     Count Two**

In count two, the government alleged that defendant devised and participated in a scheme to defraud Equis and the State of property and the right of honest services, and that

11

he transmitted a wire communication from Wisconsin to Illinois for purposes of executing the scheme. To sustain this charge, the government had to prove that: (1) defendant knowingly devised or participated in the scheme to defraud; (2) he did so knowingly and with the intent to defraud; and (3) for the purpose of carrying out the scheme or attempting to do so, he caused interstate wire communications to take place. Federal Criminal Jury Instructions of the Seventh Circuit 259 (1999). Under 18 U.S.C. § 1346, a scheme to defraud can include a scheme to deprive another of honest services. When the government alleges honest services fraud, it must prove that the defendant misused his position for private gain. See, e.g., United States v. Turner, 551 F.3d 657, 664-65 (7th Cir. 2008). The government in this case alleged both a scheme to obtain money and to deprive Equis and the State of honest services. The government proved defendant guilty beyond a reasonable doubt under both theories.

**First**, defendant devised a scheme to defraud. The scheme had a purpose to deceive the State and Equis and to obtain money for defendant. As discussed above, defendant solicited a direct payment from Silverstein, a payment to which he was not entitled under his agreement with Equis, and which he sought to conceal from both Equis and the State. Such direct, concealed payments could not be credited by Equis against defendant's draws, costing Equis money.

Defendant also misused his position in exchange for private gain, depriving both the State and Equis of his honest services. Under his contract with Equis, defendant was to be compensated directly by Equis; he was forbidden to receive direct payments and had a duty to remit any such payments to Equis at once. (Ex. 1 at 4 ¶ A.) By soliciting a secret, direct payment from Silverstein, defendant violated this duty.

12

As a broker for the State, defendant had a duty "to keep confidential any information given to the broker in confidence, or any information obtained by the broker that he or she knows a reasonable person would want to be kept confidential." Wis. Stat. § 452.133(1)(d). Defendant breached that duty by disclosing the specific details of the Roebling LOI, which contained a confidentiality clause.

Defendant claimed that this was not a sealed bid procedure, and that he therefore had no duty to keep the LOI's confidential. He relies on a statement from Peter Maternowski, DOA Bureau Director, that the "bids were not sealed." (Ex. 1060 at 4.) However, Maternowski also indicated, in the same statement, that "it would be inappropriate and contrary to the state's interest for EQUIS CORP. to provide other parties bidding information to only one or two other individual bidders." (Ex. 1060 at 5.) That is exactly what defendant did. Further, defendant's disclosure of specific bid information did not occur in a vacuum – defendant disclosed Roebling's LOI terms to the same broker from whom he sought a monetary kickback.[9] This violated defendant's duty to "loyally represent the client's interests [by] [p]lacing the client's interests ahead of the broker's interests." Wis. Stat. § 452.133(2)(a). Defendant's conduct

---

[9]Defendant claimed that under the Wisconsin Open Records Law he had a duty to disclose the LOI's upon request by any person. For the reasons set forth in my decision denying defendant's pre-trial motion on this issue (R. 28 at 6-11), it appears that the Open Records Law did not even apply to defendant. See WIREdata, Inc. v. Village of Sussex, 310 Wis. 2d 397, 437 (2008) (holding that an independent contractor hired by a governmental entity is not an "authority" under the Open Records Law and thus "not a proper recipient of an open records request"). In any event, it is clear from the facts of the case that defendant was not trying to comply with the Open Records Law here; Silverstein did not ask for the Roebling LOI under the Open Records Law; defendant disclosed its terms in exchange for a kickback. Further, defendant said nothing about the Open Records Law to Special Agent Sparacino; rather, he denied disclosing confidential information and specific bid details. Defendant notes that during one conversation he told Silverstein "everything is public." (Ex. 1061.) He takes this statement out of context. More instructive is his call to Silverstein on May 10, when he indicated that "deal structures . . . have been leaked out." (Ex. 63A at 1.)

13

made it such that Zeller did not have to truly present its best offer; all it had to do was match or approach Roebling's offer, and defendant would "run the analysis and basically back" Zeller. (Ex. 51A at 5.) The record contains no credible evidence that defendant disclosed bid information to the other LOI parties, so they might be encouraged to match or beat the best offer to date. Rather, defendant told Silverstein that he was not sharing this information with others. (Ex. 51A at 3.)

Finally, by soliciting a direct, secret payment from Silverstein, defendant violated his duty to the State to not "[a]ccept any fee or compensation related to the transaction from any person other than the broker's client, unless the broker has the written consent of all parties to the transaction." Wis. Stat. § 452.133(3)(a). As discussed herein, defendant had no intent of seeking such consent; rather, he sought to keep the payment forever secret from the State and Equis. Defendant violated these duties in exchange for a monetary kickback, a classic form of private gain. See, e.g., United States v. Thompson, 484 F.3d 877, 884 (7th Cir. 2007).

**Second**, defendant acted with the intent to defraud. The phrase "intent to defraud" means that the acts charged were done knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant, or to deprive another of honest services. Federal Criminal Jury Instructions of the Seventh Circuit 261 (1999). The recorded calls reveal that defendant acted with intent to defraud and that he knew precisely what he was doing. During his initial call to Silverstein on April 4, defendant conceded that what he was proposing wasn't right, and he used the word "kickback."[10] During subsequent conversations he suggested that Silverstein first take the taxes out, then pay him either in cash or by check

---

[10]Defendant did not use the word "kickback" during the recorded calls, but Silverstein credibly testified that he used that exact word during the April 4, 2007 (unrecorded) call.

14

to his defunct company, NACO, calling it a consultant fee. In either case, he wanted nothing in writing and nothing leaked back to Equis or to the State. These secretive maneuvers evinced a fraudulent intent.

At trial, defendant claimed that he was simply exploring a role as a designated agent for the buyer and discussing a commission split with Silverstein. However, he said nothing of the sort during either of his interviews with the FBI; in those statements, given before he knew that the FBI had his recorded conversations with Silverstein, defendant denied disclosing specific bid details or soliciting payments from Silverstein in the form of cash or a check to NACO. Nor did he ever suggest a role as a designated agent during the recorded conversations with Silverstein. Defendant claimed that Silverstein first raised the issue of designated agency in a March 22, 2007 letter, which referred to payment to Silverstein's company or "its locally designated representative." (Ex. 1015.) The letter says nothing about designated or dual agency. Finally, defendant indicated that he may have sought and obtained the necessary written authorization for such a role later, when the deal was ready for completion, but I find that he had no such intent. His intent was to keep the payment forever secret from Equis and the State. I find that defendant did not intend dual or designated agency, or anything of the sort.[11] He sought to obtain a secret payment in exchange for steering the sale to Zeller. For

---

[11] The ELA allowed dual agency only with the State's consent. (Ex. 4 at 5 ¶ 8.) Defendant clearly had no intent to obtain consent from the State; to the contrary, he wanted to keep the payment a secret. The ELA also forbid disclosures of the sort defendant made to Silverstein under a dual agency arrangement. (Ex. 4 at B-3.) Defendant claimed that he did not see the ELA until June or July 2007, and that he instead had in mind "designated agency," which another Equis employee told him was permitted. As indicated in the text, defendant had nothing of the sort in mind at the time he spoke to Silverstein in April 2007. He made no use of the term during any of his recorded conversations and did not mention it to Special Agent Sparacino during his May 10 and 18 interviews. Finally, as the government notes, under Wisconsin law designated agency means that two different employees of the same broker

15

these reasons and those stated in discussing the "corrupt" element of count one, I find that defendant acted with intent to defraud.

**Third**, on April 30, 2007, defendant transmitted an interstate wire communication for purposes of furthering the scheme. Specifically, he placed a phone call from Wisconsin to Illinois during which he disclosed the terms of the Roebling LOI. (Trial Stipulation at 5 ¶ 10.)

Therefore, I find defendant guilty of count two.[12]

## C. Count Three

In count three, the government alleged that on May 10, 2007, defendant falsely told the FBI that he never provided prospective buyers with the specific bid details submitted by other prospective buyers. In order to establish this charge, the government had to prove that: (1) defendant made a false statement; (2) the statement was material; (3) the statement was made

---

provide services to the buyer and seller; state law does not appear to contemplate one person representing both parties. See Wis. Stat. § 452.01(3w). Prior to trial, I excluded proposed expert testimony from law professor Martin Greenberg on the legal duties of brokers. At trial, defendant made an offer of proof of Greenberg's testimony, consisting of the transcript of the pre-trial hearing. In his testimony Greenberg admitted that if defendant did not intend to fully disclose his dealings he would violate his duties as a broker. The evidence showed, overwhelmingly, that defendant did not intend to do so. Therefore, even considering Greenberg's testimony, the verdict would be the same.

[12] In his post-trial brief, defendant contends that the government's case on counts one and two is predicated on three fundamental propositions: (1) that he had an absolute duty not to disclose terms of the specific proposals; (2) he could not lawfully inquire about the willingness of another broker to assign a quarter point of the other broker's commission; and (3) he knew that he could not lawfully do these things. He then proceeds to analyze the evidence under these three propositions. The government's burden in this case was to prove the elements of the offenses, as set forth above. It did so. Defendant also argues in his brief that the recorded conversations were contingent or preliminary. But § 1343 covers schemes, whether completed or not, and § 666 forbids soliciting, not merely receiving, a bribe. The fact that law enforcement disrupted the scheme before money changed hands is irrelevant. See Pasquantino v. United States, 544 U.S. 349, 371 (2005) (stating that the wire fraud statute punishes the scheme, not its success).

16

knowingly and willfully; and (4) the statement was made in a matter within the jurisdiction of the executive branch of the government of the United States. Federal Criminal Jury Instructions of the Seventh Circuit 240 (1999). A statement is false or fictitious if untrue when made and then known to be untrue by the person making it. Id. at 243. A statement is material if it had the effect of influencing the action of the agency, or was capable of or had the potential to do so. Id. at 245. The government proved these elements beyond a reasonable doubt.

**First**, on May 10, 2007, defendant denied to Special Agent Sparacino that he provided specific bid details to other prospective buyers; during his April 30, 2007 recorded conversations with Silverstein he did precisely that. Thus, his statement to Sparacino was false.[13]

**Second**, the statement was material. Although Sparacino knew at the time defendant was lying – he had access to the recorded conversations which demonstrated as much – under § 1001 a false statement may be material even though the agency did not rely on it and was not influenced by it. Turner, 551 F.3d at 663. Indeed, "it is not necessary for an allegedly false statement to have any ill effect at all, as long as it is capable of having such an effect." United States v. Ranum, 96 F.3d 1020, 1028 n.12 (7th Cir. 1996). This statement went to the core of the allegations against defendant and was designed to deflect suspicion away from him; had the statement been believed, it could have induced the FBI to turn its investigation in a different direction. See Turner, 551 F.3d at 674.

---

[13]At trial, defendant argued that he told the truth when he denied disclosing "confidential" bid information because the information he disclosed was not really confidential. Special Agent Sparacino did ask defendant about confidential information, but the indictment refers to "specific bid details," which defendant plainly disclosed.

17

**Third**, the statement was made knowingly and willfully. This was not an instance of mistaken recollection. The interview with Sparacino occurred less than two weeks after defendant's disclosure of the specific bid details to Silverstein. That disclosure occurred as part of a scheme to obtain a kickback, which defendant would keep secret from the State and Equis. Defendant knew the statement was false.

**Fourth**, the statement concerned a matter within the jurisdiction of the FBI. The FBI is authorized to detect and prosecute crimes against the United States, including wire fraud offenses. Turner, 551 F.3d at 662.

Therefore, I find defendant guilty of count three.

## D. Count Four

In count four, the government alleged that on May 18, 2007, defendant falsely told the FBI that he never suggested that Silverstein pay him directly in cash or by check payable to a company other than Equis. The elements of the offense are set forth above, and the government proved them all beyond a reasonable doubt.

**First**, defendant made a false statement. During the record conversation on April 26, 2007, defendant sought a direct payment from Silverstein, either in cash or a check to NACO, in direct contravention of his statement to Special Agent Sparacino on May 18, 2007. (Ex. 51A at 2.)

**Second**, the statement was material. As with count three, Sparacino knew at the time defendant was lying, but the statement was nevertheless designed to deflect suspicion away from defendant and could, if believed, have misdirected the FBI's investigation. See Turner, 551 F.3d at 674. The direct payment defendant denied soliciting goes to the heart of this case.

18

**Third**, the statement was made knowingly and willfully. Again, this interview with Sparacino occurred within weeks of defendant's solicitation of a direct payment in cash or by check to NACO, as part of the scheme set forth above. Defendant knew the statement was false.

**Fourth**, the statement concerned a matter within the jurisdiction of the FBI. The FBI is authorized to detect and prosecute crimes such as wire fraud and bribery. See Turner, 551 F.3d at 662.

Therefore, I find defendant guilty of count four.[14]

### III. VERDICT

On count 1, the court finds the defendant, Larry Lupton, guilty.

On count 2, the court finds the defendant, Larry Lupton, guilty.

On count 3, the court finds the defendant, Larry Lupton, guilty.

On count 4, the court finds the defendant, Larry Lupton, guilty.

Dated at Milwaukee, Wisconsin, this 16th day of March, 2008.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[14]Defendant does not address counts three and four in his post-trial brief. In a pre-trial motion, defendant moved to dismiss count four because this interview occurred under the protection of a proffer letter. As I ruled in denying the motion, the letter allowed the government to use defendant's statements if he lied. (R. 28 at 20-21.) I find that defendant lied, so there is no violation of the proffer agreement.

19