# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
            **Plaintiff,**

    **v.**                                            **Case No. 07-CR-219**

**LARRY LUPTON**
            **Defendant.**

---

## SENTENCING MEMORANDUM

Following a court trial, I found defendant Larry Lupton guilty of bribery, 18 U.S.C. § 666(a)(1)(B), wire fraud, 18 U.S.C. §§ 1343 & 1346, and two counts of making false statements to an FBI agent, 18 U.S.C. § 1001. The government proved that defendant, while acting as a real estate agent on behalf of the State of Wisconsin, Department of Administration ("DOA") regarding the sale of a state building, solicited a kickback from the broker for an interested buyer in exchange for steering the sale to the broker's client. He then twice lied to the FBI about his conduct.[1] I ordered a pre-sentence report ("PSR") and set the case for sentencing. Defendant produced his own sentencing report, and both sides filed memoranda containing their sentencing recommendations. In imposing sentence, I first calculated the advisory sentencing guideline range, then determined the ultimate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See, e.g., United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008).

---

[1]The facts of the case are set forth in full in my written findings of fact in support of the verdict. (R. 96.)

# I. GUIDELINES

The PSR recommended a base offense level of 12 under U.S.S.G. § 2C1.1(a)(2) on the bribery and fraud counts, with an 8 level enhancement based on the value of the kickback under §§ 2C1.2(b)(2) & 2B1.1(b)(1), and a 2 level enhancement for obstruction of justice under § 3C1.1 based on defendant's false trial testimony. On the false statement counts, the PSR adopted a base level of 14 under U.S.S.G. § 2J1.2(a) and again added 2 levels under § 3C1.1 based on defendant's perjury at trial. The PSR then grouped the counts under U.S.S.G. § 3D1.2, for an adjusted level of 22. Because defendant took the case to trial and refused to recognize wrongdoing, the PSR denied any reduction for acceptance of responsibility under § 3E1.1. Thus, the report recommended a final level of 22, which, coupled with defendant's criminal history category of I, produced an imprisonment range of 41-51 months.

Neither side filed objections to the PSR, so I concluded that any such objections were waived. However, because the defense sentencing report appeared to take issue with certain of the PSR's guideline calculations, and for the sake of completeness and clarity, I made further, specific findings, in addition to adopting the PSR.

## A. Obstruction Enhancement and Related Guideline Issues

As indicated, the PSR imposed an obstruction of justice enhancement under U.S.S.G. § 3C1.1 based on defendant's false testimony at trial. Section 3C1.1 requires specific intent to obstruct justice, and the government bears the burden of proving by a preponderance of the evidence that the enhancement is warranted. United States v. Ewing, 129 F.3d 430, 434 (7th Cir. 1997). When the obstruction is based on false trial testimony, the court should find all of the elements of perjury: falsity, wilfulness and materiality. United States v. Brimley, 148 F.3d

2

819, 823 (7th Cir. 1998). The testimony must be intentionally false, rather than a result of confusion, mistake or faulty memory. See United States v. Dunnigan, 507 U.S. 87, 94 (1993). The court should make specific findings, and not simply rely on the verdict.

I found that defendant wilfully provided false testimony in several respects, as identified in my written findings in support of the verdict and in the PSR. First, he lied about his intent to defraud, claiming that he was exploring a fee split or "designated agency" with the broker from whom he solicited the kickback. I found that he acted with the intent to defraud and was not exploring a legitimate fee split. This testimony was obviously material, as intent to defraud was the key issue at trial. Second, he lied in claiming that he said "if **I** get put into that situation," rather than "if I could put **you** into that situation" during one of the recorded calls with the other broker, Gabriel Silverstein. This too was material, because if believed the testimony may have tended to show that defendant was negotiating a fee split due to the State's attempt to cut the commission on the sale, rather than soliciting a bribe in exchange for steering the sale to Silverstein's client, Zeller. In other words, defendant attempted to show through his false testimony that the "situation" he referred to was the commission cut, not putting Zeller in the position of winning the bid process. Finally, he lied about when he received the written Letter of Intent ("LOI") from another prospective buyer, Roebling. Although not critical to the government's case, this too was material because it pertained to whether defendant disclosed to Silverstein information provided to him in confidence, pursuant to a specific, written confidentiality clause, in violation of his duties as a broker. Defendant engaged in this perjury with the specific intent to obstruct justice and affect the outcome of the trial.

Application note 4(b) indicates that perjury during trial is conduct that warrants the

3

enhancement under § 3C1.1. U.S.S.G. § 3C1.1 cmt. n.4(b). I found that the enhancement applied here.

I also noted that the guideline commentary indicates that when the defendant is convicted of an obstructive offense the § 3C1.1 enhancement is not to be applied to the offense level for that offense, unless further obstruction occurred during the prosecution for the obstruction offense. U.S.S.G. § 3C1.1 cmt. n.7. The commentary to U.S.S.G. § 2J1.2 says the same. U.S.S.G. § 2J1.2 cmt. n.2(A) ("For offenses covered under this section, Chapter Three, Part C (Obstruction) does not apply, unless the defendant obstructed the investigation, prosecution, or sentencing of the obstruction of justice count."). The "unless" clause applied here. Defendant was convicted of lying to the FBI, conduct which obstructed the investigation of the fraud and bribery counts, and because he committed perjury during his trial on the § 1001 counts, the PSR properly imposed the § 3C1.1 enhancements on the § 1001 counts.

However, application note 8 further indicates that if the defendant is convicted of both an obstructive offense and an underlying offense, i.e. the offense with respect to which the obstruction occurred, the counts should be grouped under U.S.S.G. § 3D1.2(c), with the offense level generally being the level for the underlying offense(s) plus the 2 level enhancement under § 3C1.1. U.S.S.G. § 3C1.1 cmt. n.8. That note also applied here. Thus, the final offense level was the level applicable to the bribery and fraud counts, plus 2 levels for obstruction. I noted that it could be argued that this, in effect, resulted in there being no extra punishment for the perjury under the guidelines. The 2 level enhancement under § 3C1.1 was warranted based on the § 1001 convictions alone. However, the government made no argument to stack another 2 level enhancement based on the perjury.

Finally, I noted that the PSR used U.S.S.G. § 2J1.2 on the § 1001 counts, but because

4

these were not aggravated offenses identified in § 1001(a) carrying a statutory maximum of 8 rather than 5 years, § 2B1.1 might apply instead. However, I did not have to address this issue because it did not affect the final guidelines, for the reasons stated; the counts were grouped, and the level applicable to the underlying offenses was greater, whichever guideline I used on the false statement counts.[2]

## B. Acceptance of Responsibility Reduction

While he also failed to object to the PSR's denial of a reduction under § 3E1.1, I addressed the suggestion in the defense sentencing report that defendant should receive credit for acceptance of responsibility because he went to trial to challenge the applicability of the statutes to his admitted conduct. The commentary to § 3E1.1 explains that a reduction may be granted when the defendant goes to trial to preserve a legal issue. U.S.S.G. § 3E1.1 cmt. n.2. For two reasons, I denied the reduction.

First, this was not a situation in which defendant went to trial just to contest questions of law; he contested facts as well, as discussed in my findings. For example, he contested what he said during certain recorded calls with Silverstein and when he received the Roebling LOI. He also contested his intent to defraud and act corruptly. While a reduction is not categorically prohibited when the defendant contests intent at trial, it should be granted rarely. See United States v. Forchette, 220 F. Supp. 2d 914, 920-23 (E. D. Wis. 2002) (collecting cases). Here, defendant's suggestion that he was exploring dual or designated agency, or a legitimate fee split, was flatly contradicted by the facts of the case, as I discussed in detail in

---

[2]I also noted that it could be argued that the base level on the underlying counts should be 14 rather than 12 under application note 1(C) to U.S.S.G. § 2C1.1. The government did not press that argument, and I therefore adopted the base level set forth in the PSR.

5

my findings.

Second, if there was any doubt, the commentary to § 3E1.1 explains that an enhancement under § 3C1.1, which I imposed here, ordinarily indicates that the defendant has not accepted responsibility. U.S.S.G. § 3E1.1 cmt. n.4. Only in extraordinary cases can both guidelines apply. This was not such a case. Defendant's conduct throughout these proceedings, up to and including his sentencing allocution, failed to reflect acceptance, at any time. Rather, he presented continually shifting justifications for his conduct (as I discussed in the findings as I discuss later herein), none of which I found credible. Therefore, I denied the § 3E1.1 reduction.

## C.    Loss Enhancement

Finally, the defense sentencing report seemed to take issue with the PSR's loss calculation, but the basis for the exception was not totally clear. The court need only make a reasonable estimate of the loss. See U.S.S.G. § 2B1.1 cmt. n.3(C). The figure used by the PSR, which was based on the value of the kickback defendant solicited from Silverstein, was reasonable under § 2C1.1(b)(2), which refers to "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest." Silverstein's expected commission was $300,000 to $360,000, a quarter of which would be $75,000, the figure used by the PSR.[3]

The defense presented no persuasive rationale for adopting some other figure. The

---

[3]Silverstein expected a commission of 1% or 1.5% on the $30,000,000+ sale. A quarter point kickback, which is what defendant solicited from Silverstein, would, based on the lower percentage, be $75,000. If anything, it appeared that the PSR's loss figure was conservative.

6

amount of the kickback was clearly greater than the potential loss to Equis based on the draw and commission figures contained in the defense report,[4] and the larger figure must be used under § 2C1.1(b)(2). The fact that I did not identify a loss amount in the trial findings was irrelevant; guideline issues are determined later. See United States v. Belk, 435 F.3d 817, 819 (7th Cir. 2006). The report also seemed to argue that no loss amount should be imposed because defendant was not a "public official" under § 2C1.1(a)(1). The argument misread § 2C1.1(b)(2), which does not limit loss enhancements to public actors. Moreover, as indicated in note 2, supra, it could be argued that defendant was a public official under this guideline. See U.S.S.G. § 2C1.1 cmt. n.1(C). When the Commission first adopted this guideline, it appeared to contemplate that the base level of 14 would apply to the official who solicited or accepted the bribe, while the level 12 would apply to those who sought to corrupt the official. See United States Sentencing Commission Guidelines Manual, Supplement to Appendix C 82 (2008) (Amendment 666).[5] Again, that position was not urged here, and I found it unnecessary to decide whether § 2C1.1(a)(1) or (2) should apply. I ultimately based this sentence on § 3553(a) factors. See United States v. Sanner, 565 F.3d 400, 406 (7th Cir. 2009) (holding that the district court need not resolve difficult guideline issues if the ultimate sentence is based on

---

[4]As discussed in my findings, and as I will again discuss later herein, the State contracted with Equis Corporation to be its exclusive agent regarding the sale of the DOA building. Equis, in turn, had retained defendant as an independent contractor and assigned him to work on the DOA sale. Pursuant to his contract with Equis, defendant was required to share with Equis any commissions he earned and to permit Equis to offset those commissions against monthly draws he previously received.

[5]In the Reason for Amendment, the Commission stated: "The higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes." Id.

7

§ 3553(a) factors).

For these reasons, I adopted the PSR's guideline calculations: offense level 22, criminal history category I, 41 to 51 months imprisonment and 2-3 years supervised release. I turned then to imposition of sentence under § 3553(a).[6]

## II. SECTION 3553(a)

**A.    Sentencing Factors**

In imposing the actual sentence, I considered the factors set forth in 18 U.S.C. § 3553(a):

    (1)    the nature and circumstances of the offense, and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed–

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

---

[6]At sentencing, defendant produced testimony from a real estate broker named Joe Wagner. While defendant argued that the testimony was relevant to the guideline issues discussed above, it seemed more like another attempt to re-open the evidence, as defendant previously tried to do. (R. 113 at 1-4.) In any event, nothing in Wagner's testimony cast doubt on either the verdicts or the guideline determinations. Wagner testified that he spoke to defendant and another Equis employee about sharing 1/4 point of his (Wagner's) commission on the DOA sale. Presumably, the testimony was meant to show that soliciting a fee split was nothing unusual. However, as Wagner testified on cross-examination, he contemplated that any fee split would go to Equis via wire transaction and would not be paid to defendant in cash or to some other company defendant owned (as defendant suggested Silverstein pay the kickback). Wagner further testified that the split would have to be disclosed, again totally unlike the transaction defendant proposed to Silverstein, which would not be reduced to writing or leaked back to the State or Equis. Finally, Wagner testified that defendant did not promise to share any specific bid details in exchange for the fee split, again unlike defendant's representations to Silverstein that he would share details not provided to others and would run the analysis to back Zeller in exchange for the bribe.

8

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the advisory guideline range;

(5)     any pertinent policy statements issued by the Sentencing Commission;

(6)     the need to avoid unwarranted sentence disparities; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute directs the court, after considering these factors, to impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public and rehabilitation of the defendant. § 3553(a)(2).

While the guidelines will generally be the starting point and the initial benchmark in making this determination, the district court may not presume that the guideline sentence is the correct one. See Nelson v. United States, 129 S. Ct. 890, 892 (2009); Gall v. United States, 128 S. Ct. 586, 596-97 (2007); Rita v. United States, 127 S. Ct. 2456, 2465 (2007). Rather, the court must independently determine an appropriate sentence based on all of the circumstances of the case and under all of the § 3553(a) factors. See Gall, 128 S. Ct. at 596-97; United States v. Carter, 530 F.3d 565, 578 (7th Cir.), cert. denied, 129 S. Ct. 474 (2008); United States v. Taylor, 586 F. Supp. 2d 1065, 1068 (E.D. Wis. 2008); see also United States v. Bartlett, Nos. 08-1196, 08-1197, 08-1198, 2009 WL 1577688, at *6 (7th Cir. June 8, 2009) ("The Court held in Kimbrough, and reiterated in Spears, that a judge need not accept the Sentencing Commission's penological framework. The court may adopt its own.").

9

**B.    Analysis**

    **1.    The Offense**

Following the court trial, I made detailed factual findings regarding the offense conduct, see Fed. R. Crim. P. 23(c), and I have not repeated all of those findings herein.  In summary, in January 2007, the Wisconsin DOA engaged Equis Corporation as its exclusive agent with the sole right to offer for sale a state office building in Madison, and Equis assigned defendant to work on the sale.  Equis had hired defendant in November 2006 as an independent contractor, and pursuant to his contract commissions on sales were to be split between defendant and Equis, and were also to be offset against his draws.  Defendant sent out an offering memorandum and created a template letter of intent for interested buyers.

One of the potential buyers was a company called Zeller, and its real estate agent was Gabriel Silverstein.  On April 4, 2007, defendant called Silverstein and asked Silverstein for a kickback on Silverstein's commission on the sale of the DOA building.  Shocked by the solicitation, Silverstein contacted authorities and agreed to cooperate in their investigation, which included recording conversations both in person and over the phone.

During an April 26, 2007 meeting, defendant stated that he wasn't making much money and asked Silverstein for a quarter point in exchange for steering the sale to Zeller.  Defendant stated that Silverstein could pay the kickback in cash or as a consulting fee to a defunct company, NACO, defendant previously operated.  Based on the figures and percentages involved in the sale, the kickback would have been about $75,000.  Defendant stated that he wanted nothing in writing, and nothing leaked back to the State or Equis.

The following day, defendant advised Silverstein of the terms of the best offer to date,

from a company called Roebling, and promised to confirm those terms once they were submitted in writing. On April 30, defendant called Silverstein and disclosed the specific bid details of the Roebling offer. Later that day, after receiving another proposal, defendant called Silverstein again and confirmed that Roebling was the only competition.

On May 1, 2007, defendant met with the DOA, then called Silverstein and advised that he recommended Zeller one and Roebling two, and that he expected the DOA to sign off on the deal's lease structure in two days.

On May 10, 2007, FBI Agent Terry Sparacino executed a search warrant at defendant's office and asked him some questions about the sale. During the questioning, defendant lied about having disclosed specific bid details; he said that he provided only general information to prospective buyers. Of course, defendant did not at the time know that the government possessed recorded conversations in which he disclosed specific bid details to Silverstein. Right after the meeting, before the agents had even reached their cars in the parking lot of defendant's office building, defendant called Silverstein and asked if Silverstein had spoken to the FBI about the deal. Like the secrecy, like the lies to the FBI, this call also reflected consciousness of guilt.[7]

On May 18, 2007, agents interviewed defendant again, and this time defendant falsely denied soliciting a payment from Silverstein in cash or via check payable to another company, like NACO. Defendant instead claimed that, if these subjects were discussed, Silverstein brought them up. Again, based on the recorded conversations, this is not what happened;

---

[7]It is also telling that defendant immediately called Silverstein after the FBI visit, not Joe Wagner – with whom he apparently discussed an ostensibly legitimate fee split – or any of the other brokers.

11

defendant solicited the payment from Silverstein, and he suggested that it be made in cash or check payable to NACO.

This was a serious crime, involving the deceit of both the State DOA and Equis, and later lies to the FBI to cover up the fraud. The defense maintained that this was permissible broker conduct, that defendant was simply exploring a fee split or designated agency, that state statutes governing brokers allowed the conduct, even that the state Open Records Law made it legal, but I rejected those defenses. Despite attempts to make this case complicated, by injecting concepts of dual or designated agency, fee splits, open records and the like, this case was actually quite simple. Defendant, acting as the agent for the DOA, solicited a kickback in exchange for steering the sale to a particular buyer. His conduct bore all of the hallmarks of fraud – secrecy, nothing in writing, lies to the FBI when they questioned his actions – actions totally inconsistent with legitimate conduct. The dissembling continued during the trial and in defendant's testimony, even during his sentencing allocution. There was no acknowledgment of the wrongfulness of any of this conduct, which constituted classic bribery and honest services fraud. This was not a political case, or even a particularly difficult case legally.

### 2.    The Defendant

Defendant was thirty-four years old and had otherwise lived a pro-social life: no prior criminal record, married, two young children to whom he seemed devoted, good work record, no substance abuse issues or prior professional discipline. Born in Korea, he was adopted by American parents at age two and had a good childhood. His family remained supportive. He graduated high school and college, performing well academically. The defense sentencing report discussed some charity work for World Relief Corporation while he was in college. I took all of these positive characteristics into account, just as I did the criminal conduct.

12

One further aspect of defendant's character and background I found it necessary to address, which received little attention in the reports, was defendant's gambling. According to records from Potawatomi Bingo and Casino obtained by the government, defendant "bought-in" a total of $576,900 at gaming tables between 2002 and 2006. He also purchased a $433,000 house in 2004. Given the limited earnings set forth in ¶ 86 of the PSR, which revealed annual incomes of $24,000 to $35,000 from 2003 to 2005, and just $281 in 2006, as well as the other evidence, including a home foreclosure judgment obtained against defendant shortly before he committed this offense, it appeared that defendant was plainly living beyond his means. The defense report stated only that defendant's interest in gambling was "passing," and that he "acted responsibly by gambling primarily with the money he had previously won." The figures presented by the government at trial and in its sentencing memo contradicted that assertion. In fact, the records showed significant gambling losses in early 2007, shortly before defendant commenced this scheme. It was a concern that defendant did not seem to regard gambling ½ million dollars, on his income, as any sort of issue. During the recorded conversation he told Silverstein that he wasn't making much money, and the motive for this offense did not seem to be any more complicated than that.

### 3. Purposes of Sentencing

Under all the circumstances, I found a period of confinement necessary. A probationary sentence, as defendant suggested, although permissible under the statutes, was insufficient to satisfy the purposes of sentencing.

First, as discussed above, the offense was serious, demonstrating a pattern of deceit that continued with lies to the FBI and the court. As the government stated at sentencing, defendant constantly shifted tactics throughout the investigation and these proceedings. When

13

first questioned by the FBI, he claimed that he did not solicit the kickback or disclose specific bid details. When confronted by the recorded conversations in which he did just that, he first suggested that the FBI doctored the tapes, then attempted to concoct a defense based on fee splitting, designated agency and the Open Records Law, arguing that the solicitation and disclosure (which he initially denied had occurred) constituted perfectly legal, normal broker conduct. In so doing, he ignored the clear evidence – his own words on tape – debunking any such defense. The need for just punishment and promotion of respect for the law demanded a period of confinement to send a message that this type of conduct would not be tolerated.

In his sentencing memo, defendant argued that the gravamen of the offense was his breach of state fiduciary duties of real estate brokers. Of course, there was more to the case than that; defendant acted with intent to defraud Equis and the State. Defendant also noted that under the applicable contracts he was entitled to share in the commission on the sale of the DOA building; however, he was not entitled to a secret payment in cash or allocated to a defunct company, after the taxes were taken out, as he proposed to Silverstein. Defendant argued that through his efforts the proposed sale price was pushed up, to the benefit of the state, which was going to pay a commission regardless, unaffected by how the brokers involved split it. However, because of defendant's conduct, Zeller did not have to truly present its best offer; it simply had to approach the Roebling offer and defendant would back Zeller. In any event, in an honest services case a victim like the State DOA need not suffer a financial loss.[8] Further, as I noted in the findings and as the government stressed in its memo, the

---

[8]As the government noted, based on defendant's misconduct, the sale was cancelled, the State lost out on the revenue, and the prospective buyers lost the chance to acquire this asset.

14

conduct did have the potential to cause monetary loss to Equis, which had the right to apply commissions against defendant's draws. Finally, defendant lied to both the FBI and the court to cover up his fraud. Merely referring defendant to state licencing authorities, as he suggested, would not promote respect for the federal laws violated here. Nor would a period of home confinement or supervision in the community.

Given his lack of record and other positive qualities, I did not see a strong need to protect the public from defendant, but there was a need to deter, generally and specifically. Those tempted to engage in similar fraud must learn that there are stern consequences, and defendant himself had to be deterred from further or continued fraud. I did not really see any treatment needs here; perhaps gambling treatment, but nothing in defendant's submissions indicated that he needed or wanted that.

Defendant asked me to consider the collateral consequences of the convictions, including the fact that he was now a convicted felon, and the significant publicity, which he claimed addressed the need for general deterrence. This case garnered some attention, but I found that the fact of prosecution alone would not deter and promote respect for the law; a prison sentence that recognized the seriousness of the offense was necessary to comply with those purposes of sentencing. I can consider collateral consequences, including those that flow from a felony conviction, as well as professional consequences. See, e.g., United States v. Hanson, 561 F. Supp. 2d 1004, 1008 (E.D. Wis. 2008); United States v. Scott, 503 F. Supp. 2d 1097, 1103 (E.D. Wis. 2007). In this case, though, the misconduct stemmed from defendant's profession, so I did not find it appropriate to give the loss of defendant's broker job significant weight. Any professional consequences as a broker were warranted; this was not a case where the crime was wholly unrelated to the profession, yet the defendant suffers

15

professional consequences nonetheless.  I did note that defendant lost not only the broker job with Equis, which flowed from the crimes, but also the job he obtained thereafter, as indicated in ¶ 80 of the PSR, which was not so related.  His family also suffered serious financial consequences, which were discussed in the reports.  Separation from defendant's family due to a prison term would certainly affect both.  I took these factors into account.

Defendant also asked me to consider the need to avoid unwarranted disparity under 18 U.S.C. § 3553(a)(6), listing sentences and punishments imposed on other licensed, regulated professionals.  The Seventh Circuit recently discussed how § 3553(a)(6) applies to such comparisons.  In Bartlett, 2009 WL 1577688, the court explained that § 3553(a)(6) is primarily concerned with system-wide disparity in federal cases, and that the best way to avoid such disparity is to follow the guidelines.  However, the court also acknowledged that under Booker and its progeny, courts may engage in individual comparisons not because of § 3553(a)(6), but despite it.  Id. at *6.  Nevertheless, while I was authorized to consider these comparisons, I did not find them persuasive in this case.

Defendant first mentioned the Hausmann case, see United States v. Hausmann, 345 F.3d 952 (7th Cir. 2003), but aside from noting that they both involved honest services fraud, he failed to explain how that case was comparable to this one.  He then listed various disciplinary actions against brokers by the Wisconsin Department of Regulation and Licensing, but none of those cases were felony criminal matters, or involved violations of federal law, and I found that they provided little, if any, guidance on what I should do here.  While those cases involved violations of the statutes governing brokers, which was a part of this case, none involved solicitation of a kickback, lies to the FBI, or perjury during a trial.

16

### 4.     Guidelines and Government's Recommendation

The guidelines called for a prison term of 41-51 months, and the government recommended 48 months.  Although, for the reasons stated, I agreed that a prison term was needed, I found these recommendations somewhat greater than necessary.

First, the range was significantly elevated because this was, in part, an honest services fraud case, rather than a case solely about the deprivation of money or property.[9]  U.S.S.G. § 2C1.1 carries a base level of 12 or 14, in addition to the loss amount from the § 2B1.1 table, while the guideline applicable to money/property wire fraud cases carries a base level of just 7.  See U.S.S.G. § 2B1.1(a)(1).  The Commission has not explained why significantly greater penalties are warranted for honest services fraud.  The Commission adopted these base levels in amendment 666, and in the Reason for Amendment section stated only: "This amendment increases punishment for bribery, gratuity, and 'honest services' cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses.  This amendment reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses."  United States Sentencing Commission Guidelines Manual, Supplement to Appendix C 82 (2008) (Amendment 666).  The Commission also provided little explanation when it first proposed the amendment, other than to note that it responded to concerns expressed by the Public Integrity Section of the Justice Department that §§ 1341-1343 offenses be prosecuted under 2C1.1 rather than the fraud guideline.  See http://www.ussc.gov/FEDREG/fedreg1203.pdf.  I was unable to locate any working group or

---

[9]The government prosecuted this case both as an honest services fraud and a deprivation of money/property case, and I found that it established guilt under both theories.

17

other reports discussing the increase. Had U.S.S.G. § 2B1.1 applied, it appeared that the range would have been 24-30 months.

It may be that public corruption cases are, in general, more serious than garden variety money/property fraud cases. Such crimes may damage public confidence in government. Thus, it may be that at least in some cases enhanced punishment would be warranted. But under the facts of this case, I did not see a need for significantly greater punishment. Cf. United States v. Orsburn, 525 F.3d 543, 546-47 (7th Cir. 2008) (finding that in some cases use of U.S.S.G. § 2C1.1 rather than U.S.S.G. § 2B1.1 may produce greater punishment than is warranted.

The offense conduct here did not reflect the sort of governmental corruption at which the statutes and guidelines are most directly targeted. This case involved a broker, operating in the world of commission sales, attempting to increase his take on a particular transaction. While I did not in any way excuse defendant's conduct, I did not see this as a case of political corruption (or political in any way). As indicated earlier, it was a pretty straightforward case. I did not agree with defendant's contention that the case did not undermine public confidence in state procurement or sales processes; it may have. But this was not a systemic type of corruption; it related to a single transaction. I gave this factor some weight, particularly in considering the guidelines' recommendation, but it did not support a probationary sentence; the fraud simply went on too long, including lies to the FBI and the court, to make that appropriate.

Second, based on defendant's lack of any prior record, I found the guideline range somewhat greater than necessary to protect the public and deter. Research suggests that true first time offenders, like defendant, have a very low recidivism rate. See United States v.

18

Germosen, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citing studies). However, I did agree with the government that this factor was offset somewhat by the pervasiveness of the deceit in this case, which included lies to the FBI and the court. Ordinarily, a first-time offender with a positive background, like this defendant, could come into court and explain that he suffered a one-time lapse in judgment, which he was not likely to repeat. Maybe he acted due to a dire financial situation, such as a foreclosure or significant gambling losses. But in this case, I could not make that determination; the fraud may have been limited to a single transaction, but it continued with lies to the FBI and the court; it continued throughout the case; even at sentencing, defendant continued to dissemble; there was never any acknowledgment of wrong-doing in any respect. Judge Posner once explained that the § 3E1.1 reduction for acceptance of responsibility is not granted just to induce guilty pleas; "it is also to reflect the reduced risk of recidivism of a defendant who by facing up to the wrongfulness of his conduct takes the first step to better behavior in the future." See United States v. Lopinski, 240 F.3d 574, 575 (7th Cir. 2001). I saw none of that here.[10]

### III. CONCLUSION

Under all the circumstances, I found a sentence of 24 months sufficient but not greater

---

[10]At sentencing, defendant argued for leniency because he agreed to a court trial and stipulated to some of the facts of the case. Because defendant perjured himself at trial and denied or deviated from some of his own recorded statements, I could not agree. Defendant also argued for leniency because he never completed the scheme. But that was only because law enforcement became involved. As the Commission aptly states in the commentary to U.S.S.G. § 2C1.1: "Offenses involving attempted bribery are frequently not completed because the offense is reported to authorities or an individual involved in the offense is acting in an undercover capacity. Failure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain. Therefore, solicitations and attempts are treated as equivalent to the underlying offense." U.S.S.G. § 2C1.1 cmt. background.

19

than necessary. The sentence was based on § 3553(a) and would have been the same regardless of the guidelines. Therefore, I committed defendant to the custody of the Bureau of Prisons for 24 months on all counts to run concurrently. I recommended that defendant be designated to a facility as close to Milwaukee as possible. Based on his financial situation, I determined that he lacked the ability to pay a fine and so waived the fine.

Upon release, I ordered him to serve two years of supervised release. I found the low end of the advisory guideline range sufficient, given defendant's lack of record and family support. While on supervised release, in addition to the standard conditions, I ordered that defendant could not hold employment having fiduciary responsibilities without first notifying the employer of his conviction, and could not hold self-employment having fiduciary responsibilities without consent of the supervising probation officer. I further ordered him to provide access to all financial information requested by the supervising probation officer. Other terms and conditions of the sentence appear in the judgment.

Defendant sought continued bail pending appeal. In order to obtain such relief, defendant had to show: (A) by clear and convincing evidence, that he was not likely to flee or pose a danger to the safety of any other person or the community if released; and (B) that the appeal was not for the purpose of delay and raised a substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that did not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process. 18 U.S.C. § 3143(b)(1).

In his bail motion, defendant focused on the first requirement, and I had no reason to believe that defendant posed a danger or a flight risk. However, he devoted next to no time to showing a substantial question of law or fact likely to result in one of the outcomes listed in

the statute. He simply referred to his previous motions and compared his case to Georgia Thompson's. See United States v. Thompson, 484 F.3d 877 (7th Cir. 2007). This case was nothing like Georgia Thompson's. As discussed above, this was a classic bribery and honest services cases; Seventh Circuit precedent has, for many years, permitted kickback prosecutions under § 666 and 1346. Nor did I find any significant merit in any of defendant's pre-trial motions.

Further, in order to grant release, I had to find that, based on a substantial question of law or fact, the appellate court was likely to reverse the convictions or order a new trial on all counts for which imprisonment had been imposed. A substantial question is one that is a close question or one that very well could be decided the other way. The substantial question must be one that would result in reversal or a new trial on all counts for which the defendant has been sentenced to prison. Otherwise, the reason for allowing bail on appeal, that a defendant should not be imprisoned under a legally erroneous sentence, disappears. See United States v. Bilanzich, 771 F.2d 292, 298-300 (7th Cir. 1985). In this case, defendant had to show a likelihood of reversal on all four counts, including the false statement counts, which he did not even attempt to do.

For these reasons and those stated in my previous rulings denying defendant's motions, defendant failed to meet the § 3143(b) standard. I therefore denied the motion for bail pending appeal.

Dated at Milwaukee, Wisconsin, this 29th day of June, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge